Argued and submitted September 26, reversed in part and remanded for further review in consideration of all relevant exception criteria, including provisions of OAR chapter 660, division 4; otherwise affirmed December 21, 2005

## 1000 FRIENDS OF OREGON,
Friends of Yamhill County,
Fair Housing Council of Oregon,
and Charlie Harris,
*Petitioners below,*

*and*

## COLUMBIA EMPIRE FARMS, INC.,
*Petitioner,*

*v.*

## YAMHILL COUNTY
and Department of Transportation,
*Respondents.*

2004-169, 2004-171, 2004-172, 2004-173, 2004-180,
2004-194, 2004-197, 2004-214, 2004-215; A129506

126 P3d 684

Jeffrey G. Condit argued the cause for petitioner. With him on the brief were Kelly S. Hossaini and Miller Nash LLP.

Kathy A. Lincoln, Assistant Attorney General, argued the cause for respondents. With her on the joint brief were Hardy

Myers, Attorney General, Mary H. Williams, Solicitor General, Erin C. Lagesen and Bonnie E. Heitsch, Assistant Attorneys General, and Rick Sanai.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Deits, Judge pro tempore.

BREWER, C. J.

**BREWER, C. J.**

Petitioner, Columbia Empire Farms, Inc., seeks review of a Land Use Board of Appeals (LUBA) decision upholding three Yamhill County ordinances.[1] The ordinances approve exceptions to Statewide Land Use Planning Goals 3, 11, and 14, and amend the Yamhill County Comprehensive Plan text and map and zoning ordinance text and map to facilitate location of a proposed highway, the Newberg-Dundee Bypass (the bypass). Petitioner makes five assignments of error. As a principal theme, those assignments of error assert that LUBA misinterpreted applicable statutes and Land Conservation and Development Commission (LCDC) rules governing exceptions to statewide land use planning goals that are required for the siting of highways on rural agricultural land. We review the challenged aspects of LUBA's decision for errors of law, ORS 197.850(9)(a); *Kelley v. Clackamas County*, 158 Or App 159, 165, 973 P2d 916 (1999), and reverse in part and affirm in part.

We take the pertinent history of the case from LUBA's decision:

"Intervenor-respondent Oregon Department of Transportation (ODOT) has been involved in a lengthy process to develop what is known as the Newberg-Dundee Transportation Improvement Project (NDTIP). The NDTIP is a bypass project for state Highway 99 between (from southwest to northeast) the cities of Dayton, Newberg, and Dundee. The purpose of the bypass is to alleviate congestion on Highway 99, particularly in Dundee where the highway narrows from four lanes to two. The NDTIP also includes connections to Highways 18 and 219, and includes a new road connecting the bypass to existing Highway 99 in Dundee. The proposed bypass is an approximately 11 mile long, four-lane limited access highway extending through rural lands in Yamhill County and through the Newberg and Dundee urban areas. Exceptions to goals 3, 11, and 14 are required to locate the bypass on rural lands.

---

[1] Petitioners before LUBA were 1000 Friends of Oregon, Friends of Yamhill County, Fair Housing Council of Oregon, Charlie Harris, and Columbia Empire Farms, Inc. Only Columbia Empire Farms, Inc., has petitioned this court for judicial review.

"The bypass is being developed as a tiered environmental impact statement (EIS) pursuant to the National Environmental Policy Act (NEPA). In the first tier, transportation objectives are developed and studied. The first tier identifies a corridor that is approximately 40% wider than the actual road right-of-way will occupy to allow for siting flexibility during the second tier, or design level phase. During the second tier, ODOT will review different bypass alignment alternatives within the selected corridor. During the second tier, ODOT must also determine the location of supporting roadways, intersecting roadways, and interchange connections and identify modifications or improvements to existing elements of the local street network that are necessary to support the bypass project or to achieve compliance with the applicable comprehensive plans.

"Eight alternatives were analyzed, and ODOT and [Yamhill County (the county)] selected alternative 'Modified 3J' as the preferred alternative. The preferred alternative begins in the southwest at a location near the existing junction of Highway 99 and 18, called the Dayton Interchange. The Dayton Interchange is located on Class I soils that are planned and zoned for exclusive farm use (EFU). The Dayton Interchange adjoins vacant land within Dayton's urban growth boundary (UGB). To the northeast of the Dayton Interchange, the bypass parallels Highway 99 to the south and is also south of an existing railroad track that extends to Newberg. This portion of the bypass will be located entirely on EFU land, most of which is prime farmland.

"Continuing to the northeast, the bypass crosses land that is mostly zoned EFU, with some affected properties zoned for rural residential use. The proposed East Dundee interchange, which connects the bypass to Highway 99, is located in the section of the bypass between Dundee and Newberg. The interchange and connector road are located on EFU and rural residential lands. South of the proposed interchange is vacant land within the Dundee UGB. Outside the UGB, rural residential land is located just north and northeast of the proposed interchange. East of the proposed Highway 219 interchange in Newberg, the bypass crosses EFU land, reenters Newberg, and then terminates east of the Newberg UGB at the East Newberg Interchange. We have included a map from Record 731 at the end of the

opinion. The county approved the proposed bypass after extensive local hearings."[2]

*1000 Friends of Oregon v. Yamhill County*, 49 Or LUBA 640, 642-43 (2005) (footnote omitted). The proposed bypass would run through petitioner's farm.

In its first assignment of error, petitioner asserts that LUBA erred in upholding the county's interpretation of ORS 197.732(1)(c)(A),[3] which codifies Goal 2, Part II, and establishes standards for taking exceptions to statewide land use planning goals and in upholding the county's interpretation of OAR 660-012-0070(4),[4] an LCDC rule governing exceptions for transportation improvements on rural land. We address petitioner's particular arguments after the following background discussion of the statutes and rules governing exceptions in light of the procedural history of this case.

An "exception" is "a decision to exclude certain land from the requirements of one or more applicable statewide goals * * *." OAR 660-004-0000(2). ORS 197.732(1)—codifying Goal 2, Part II—allows local governments to adopt exceptions to statewide land use goals if certain requirements are met. There are three types of exceptions, standards for which are set out respectively in ORS 197.732(1)(a), (b), and (c). This case involves exceptions under ORS 197.732(1)(c).

ORS 197.732(1)(c) sets out four standards that local governments must meet in order to adopt an exception under that provision:

---

[2] A copy of the map is appended to this opinion.

[3] The text of ORS 197.732(1)(c) is set out below. 203 Or App at 328.

[4] OAR 660-012-0070(4) provides:

"To address Goal 2, Part II(c)(1) the exception shall provide reasons justifying why the state policy in the applicable goals should not apply. Further, the exception shall demonstrate that there is a transportation need identified consistent with the requirements of OAR 660-012-0030 which cannot reasonably be accommodated through one or a combination of the following measures not requiring an exception:

"(a) Alternative modes of transportation;

"(b) Traffic management measures; and

"(c) Improvements to existing transportation facilities."

"(A)   Reasons justify why the state policy embodied in the applicable goals should not apply;

"(B)   Areas which do not require a new exception cannot reasonably accommodate the use;

"(C)   The long term environmental, economic, social and energy consequences resulting from the use at the proposed site with measures designed to reduce adverse impacts are not significantly more adverse than would typically result from the same proposal being located in areas requiring a goal exception other than the proposed site; and

"(D)   The proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts."

LCDC adopted rules implementing those standards. *See* ORS 197.736 (giving LCDC rulemaking authority). We first examine OAR chapter 660, division 4, entitled "Interpretation of Goal 2 Exception Process," which "interprets the exception process as it applies to statewide Goals 3 to 19." OAR 660-004-000(1). In particular, OAR chapter 660, division 4, "explain[s] the three types of exceptions set forth in Goal 2 * * *, Part II," *i.e.*, in ORS 197.732(1). OAR 660-004-0000(1). OAR 660-004-0020(2)(a) to (d) restate the four exception standards from ORS 197.732(1)(c) quoted above and explain how those standards may be met. The first of those four standards, commonly referred to as the "reasons" standard, requires that the local government identify reasons that " 'justify why the state policy embodied in the applicable goals should not apply[.]' " OAR 660-004-0020(2)(a) (quoting ORS 197.732(1)(c)(A)). When, as here, the exception sought involves a use on resource land not allowed under the goals, OAR 660-004-0022 describes types of reasons that may be used. With respect to transportation uses on rural lands, the type of exception sought here, OAR 660-004-0022 provides that "[t]ransportation improvements not allowed on rural lands * * * require an exception pursuant to OAR 660-012-0070 and this division." OAR 660-004-0022(12).

OAR chapter 660, division 12, sets out rules implementing Goal 12, the "Transportation" goal. Both by its own terms and the terms of OAR chapter 660, division 4, an exception for a transportation improvement on rural lands

must meet the standards of both divisions. We derive that conclusion from OAR 660-004-0022(12), quoted above, and from OAR 660-012-0070(2), which provides that, "[w]here an exception to Goals 3, 4, 11, or 14 is required, * * * the exception shall be taken pursuant to * * * OAR chapter 660, division 4 and this division." OAR 660-012-0070(4) to (8) set out particular requirements for addressing the four exception standards from ORS 197.732(1)(c)—which, again, mirror the exception standards in Goal 2, Part II(c)—in the context of exceptions that would site transportation improvements on rural lands.

To summarize our review of the background law so far, this exception is a particular type of ORS 197.732(1)(c)—or Goal 2, Part II(c)—exception, namely an exception to allow transportation improvements on rural land. As such, LCDC's rules require that the local government satisfy the four exception standards in ORS 197.732(1)(c)—or Goal 2, Part II(c)—*both* as those standards are explained in the general rules relating to Goal 2 exceptions—OAR chapter 660, division 4—*and* as those standards are explained in the particular rules relating to those exceptions seeking to allow transportation improvements on rural land—OAR chapter 660, division 12.

As noted, the first ORS 197.732(1)(c) exception standard requires local governments to provide reasons why the pertinent policy in the goals should not apply. ORS 197.732(1)(c)(A). The second ORS 197.732(1)(c) exception standard requires that, in order to adopt an exception, the body seeking the exception must show that areas that would not require an exception cannot reasonably accommodate the use. ORS 197.732(1)(c)(B). Both division 4 and division 12 of OAR chapter 660 flesh out each of those requirements. OAR 660-004-0020(2)(a), (b); OAR 660-012-0070(4), (5). For purposes of discussing petitioner's first assignment of error, we note the following: (1) OAR 660-012-0070(4)—which fleshes out the "reasons" exception standard of ORS 197.732(1)(c)(A)—requires a local government to demonstrate that there is a transportation need that cannot be accommodated through certain specified "measures" that would not require an exception; (2) OAR 660-012-0070(5)—which fleshes out the "areas" exception standard of ORS

197.732(1)(c)(B)—requires that the proposed use cannot be accommodated in another "location" that would not require an exception; (3) OAR 660-012-0070(6) requires that, to determine the reasonableness of "alternatives" (*i.e.*, different, nonexception "measures" under OAR 660-012-0070(4) and different, nonexception "locations" under OAR 660-012-0070(5)), the local government must choose "thresholds" to judge whether the alternative "cannot reasonably accommodate the proposed transportation need * * *." Under OAR 660-012-0070(6), those thresholds must be justified in the exception.[5]

The county identified five such thresholds. The five thresholds related to (1) operational feasibility and minimum compliance with Oregon Highway Plan highway mobility standards (the OHP standards); (2) economic displacements; (3) community livability; (4) consistency with local adopted Transportation System Plan (Yamhill County's TSP) and community vision statements; and (5) highway safety. Petitioners below challenged before LUBA the identification of those thresholds, particularly aspects of the OHP standards.

LUBA upheld the county's choice of thresholds, and particularly the OHP standards. The OHP standards establish preferences for treating designated freight routes as "expressways" and include a bypass policy stating that new bypasses must be designed in accordance with freeway or expressway standards. Before LUBA, ODOT and the county argued that reliance on the OHP standards was appropriate because a provision of the LCDC transportation planning rules, OAR 660-012-0020(3)(a)(B), requires the state to establish standards for transportation facility performance on state highways.[6] That provision states that, for state and

---

[5] OAR 660-012-0070(6) provides:

"To determine the reasonableness of alternatives to an exception under sections (4) and (5) of this rule, cost, operational feasibility, economic dislocation and other relevant factors shall be addressed. The thresholds chosen to judge whether an alternative method or location cannot reasonably accommodate the proposed transportation need or facility must be justified in the exception."

[6] A "transportation facility" is "any physical facility that moves or assist[s] in the movement of people or goods * * *." OAR 660-012-0005(24).

regional transportation facilities, "the transportation capacity analysis shall be consistent with standards of facility performance considered acceptable by the affected state or regional transportation agency[.]" Because the OHP standards serve as the state's "Transportation System Plan" (TSP), as defined in OAR 660-012-0005(32),[7] LUBA concluded that those standards constitute an appropriate measure of "reasonableness" for testing alternatives to a goal exception under OAR 660-012-0070(4) and (5).

■　　With that context in mind, we turn to the specific arguments in petitioner's first assignment of error. Petitioner first challenges LUBA's conclusion that the OHP standards, as used here, constitute an appropriate measure of "reasonableness" for testing alternatives to a goal exception under OAR 660-012-0070(4) and (5). According to petitioner, ORS 197.732(1)(c)(A) and OAR 660-012-0070(4) require that all reasonable alternatives be considered, particularly in consideration of the state policy embodied in Goal 3 relating to preservation of agricultural land. Petitioner reasons that, if, by adopting OHP standards, ODOT can narrow the threshold "so that only a high-speed limited access bypass that displaces the fewest number of existing businesses or residences is a 'reasonable alternative,' farm land will always be the only 'reasonable' location."

Although petitioner suggests that the way the county applied the OHP standards as a threshold violates ORS 197.732(1)(c)(A) and OAR 660-012-0070(4), it does not ground its argument in the wording of either provision. Instead, petitioner's argument is based on the premise that "farmland is different." Particularly, petitioner contends that, because the heavy weight of state policy under Goal 3 is on the preservation of farmland over converting it to urban uses, "the threshold set by the county is so restrictive that it does not comply with ORS 197.732(1)(c)(A) and OAR 660-012-0070(4)." That understanding, however, is not reflected in either ORS 197.732(1)(c)(A) or OAR 660-012-0070(4), and

---

[7] OAR 660-012-0005(32) defines "Transportation System Plan" to mean "a plan for one or more transportation facilities that are planned, developed, operated and maintained in a coordinated manner to supply continuity of movement between modes, and within and between geographic and jurisdictional areas."

we decline to insert what the legislature and LCDC have omitted. Although it seems that petitioner would require local governments to consider the policy behind the goals under the second ORS 197.732(1)(c) exception standard—the standard related to considering location alternatives—such policy-based balancing must primarily occur when the local government applies the earlier "reasons" step of the exception process. Petitioner does not otherwise explain why the way the county used the OHP standards as a threshold was inappropriate. Accordingly, we affirm LUBA's conclusion that the county did not misuse the OHP standards as a "reasonableness" threshold.

■ Second, petitioner challenges LUBA's conclusion that "OAR 660-012-0070(4) sets out the analysis that is required to demonstrate that the state policy embodied in the applicable goals should not apply. That analysis substitutes for direct application of ORS 197.732(1)(c)(A) and Goal 2, Part II (c)(1)." *1000 Friends*, 49 Or LUBA at 647. Petitioner argues, in part, that "[t]he text of OAR 660-004-0022(12) * * * in no way indicates that transportation facilities through rural lands must only comply with OAR 660-012-0070 and are otherwise given a free pass from having to comply with the other exceptions requirements. LUBA's conclusion to the contrary is in error."

We agree with petitioner. Nothing in ORS 197.732, in Goal 2, Part II, or in the applicable provisions of OAR chapter 660, divisions 4 and 12, countenances permitting an exception to a goal for a transportation improvement based solely on the transportation improvement standards without application of the exception criteria in ORS 197.732, Goal 2, Part II, and OAR chapter 660, division 4. On the contrary, as noted above, both pertinent rule divisions indicate that, in these circumstances, the requirements of *both* divisions must be satisfied. OAR 660-004-0022(12) provides that "[t]ransportation improvements not allowed on rural lands as provided for in OAR 660-012-0065 require an exception *pursuant to OAR 660-012-0070 and this division.*" (Emphasis added.) In complementary fashion, OAR 660-012-0070(2) provides that, "[w]here an exception to Goals 3, 4, 11, or 14 is required, in addressing Goal 2, Part II(c), the exception shall be taken pursuant to ORS 197.732(1)(c), Goal 2, *OAR chapter*

*660, division 4 and this division.*" (Emphasis added.) In addition, LCDC has indicated that, "[e]xcept as provided for in OAR chapter 660, division 14, 'Application of the Statewide Planning Goals to the Incorporation of New Cities,' this Division interprets the exception process as it applies to statewide Goals 3 to 19." OAR 660-004-0000(1). That provision demonstrates that, when LCDC means to exempt certain kinds of actions from the exception process in OAR chapter 660, division 4, it knows how to do so. Neither the legislature nor LCDC has indicated that the OAR chapter 660, division 4, exception requirements do not apply in these circumstances.

It is true that OAR 660-012-0070 mirrors the requirements of Goal 2, Part II, and portions of ORS 197.732. As a consequence, application of that provision may often address the exception standards in the goal and the statute. The most cursory review of the requirements of OAR 660-004-0020, however, disabuses a reader of the notion that a comprehensive shortcut for the exception process is available in OAR 660-012-0070. The inquiry required to justify an exception under OAR 660-004-0020 is much more detailed than that set out in Goal 2, Part II, ORS 197.732, and OAR 660-012-0070. Although local governments are faced with no mean task when addressing the standards in OAR chapter 660, division 4, and OAR chapter 660, division 12, the two sets of standards are not necessarily incompatible. Under ordinary principles of rule construction, both sets of requirements must be harmonized, if necessary, and applied. *Dept. of Human Resources v. Trost*, 160 Or App 656, 662, 983 P2d 549 (1999); *Friends of Neabeack Hill v. City of Philomath*, 139 Or App 39, 47-50, 911 P2d 350, *rev den*, 323 Or 136 (1996).

The parties do not refer us to any findings in which the county demonstrated its compliance with pertinent portions of both OAR chapter 660, division 4, and OAR chapter 660, division 12. We note, however, that, contrary to LUBA's apparent assumption, and that of respondents in their brief on judicial review, the county's exception document appears to treat both rule divisions as applicable to the issue of why taking land protected by Goal 3 is necessary. The county's findings address at length why alternatives not requiring an exception fail to meet the identified transportation needs.

However, as discussed, we disagree with LUBA's conclusion that OAR 660-012-0070(4) provides the exclusive criteria to satisfy ORS 197.732(1)(c)(A) and Goal 2, Part II(c)(1). Accordingly, we must remand LUBA's decision for further review in consideration of all relevant exception criteria, including the provisions of OAR chapter 660, division 4.

■　　In its second assignment of error, petitioner asserts that LUBA erred in upholding the county's decision because the county failed to demonstrate that land not requiring a new exception cannot reasonably accommodate the need for additional transportation capacity. Such a showing is required under ORS 197.732(1)(c)(B), Goal 2, Part II(c)(2), and OAR 660-004-0020(2)(b). Petitioner asserts that the county addressed eight alternatives requiring goal exceptions, but that it failed to consider or prematurely rejected other alternatives not requiring an exception. According to petitioner, the county did not consider other alternatives merely because those alternatives did not meet the operational and mobility thresholds identified in the OHP standards. In petitioner's view, those omissions transgressed ORS 197.732 and the goal exception criteria set out in OAR chapter 660, division 4.

Respondents reply that the county rejected petitioner's proposed alternatives because those alternatives did not satisfy the applicable transportation facility requirements, not because it failed to apply the applicable exception criteria. In addition, respondents assert that petitioner's proposals were not specific enough to require consideration under OAR 660-004-0020(2)(b)(C) and (c). That rule states that "[a] detailed evaluation of specific alternative sites is not required unless such sites are specifically described with facts to support the assertion that the sites have significantly fewer adverse impacts * * *." OAR 660-004-0020(2)(c).

Petitioner counters that its proposals satisfied OAR 660-004-0020(2)(b)(C) and (c), but that LUBA rejected its argument merely because it mistakenly believed that it had to consider only the goal exception requirements set out in OAR 660-012-0070. We disagree with petitioner's characterization of LUBA's analysis. LUBA expressly rejected petitioner's alternative sites because it found that those sites did

not satisfy the OHP standards. As discussed, LUBA did not err in upholding the county's use of those standards as "thresholds" for determining whether a proffered alternative is suitable for the planned transportation improvement project. In addition, LUBA did not ignore the specificity requirements of OAR 660-004-0020(2)(b)(C) and (c); instead, it specifically discussed those provisions in addressing petitioner's proposed alternatives.[8] We therefore reject petitioner's second assignment of error.

■ In its third assignment of error, petitioner asserts that LUBA erred in upholding the county's application of ORS 197.732(1)(c)(C). That statute requires a local government adopting an exception to show that the

> "long term environmental, economic, social and energy [(ESEE)] consequences resulting from the use at the proposed site with measures designed to reduce adverse impacts are not significantly more adverse than would typically result from the same proposal being located in areas requiring a goal exception other than the proposed site[.]"

According to petitioner, the county disregarded that requirement by finding that neither the application of OAR 660-012-0070(7) nor the application of OAR 660-004-0020(2)(c)[9]

---

[8] LUBA's application of OAR 660-004-0020 in this and other portions of its opinion appears to be at odds with its conclusion that transportation improvement exceptions need to satisfy only OAR chapter 660, division 12. *See* 49 Or LUBA at 647. In light of our holding that the exception criteria of both divisions must be satisfied, LUBA's treatment of this issue on remand will need to be made consistent.

[9] OAR 660-004-0020(2)(c) recites the same criteria as found in ORS 197.732(1)(c)(C), with some elaboration. OAR 660-004-0020 provides, in part:

"(2) The four factors in Goal 2 Part II(c) required to be addressed when taking an exception to a Goal are:

"(a) 'Reasons justify why the state policy embodied in the applicable goals should not apply': The exception shall set forth the facts and assumptions used as the basis for determining that a state policy embodied in a goal should not apply to specific properties or situations including the amount of land for the use being planned and why the use requires a location on resource land;

"(b) 'Areas which do not require a new exception cannot reasonably accommodate the use':

"* * * * *

"(c) The long-term environmental, economic, social and energy consequences resulting from the use at the proposed site with measures designed to reduce adverse impacts are not significantly more adverse than would typically result from the same proposal being located in other areas requiring a Goal exception. The exception shall describe the characteristics of each alter-

establishes a priority for agricultural land when a local government determines that a transportation need cannot be met by alternatives that do not require a new exception. Petitioner argues that LUBA's approval of the county's interpretation of ORS 197.732(1)(c)(C) was an error in substance and, further, resulted in a decision that was not supported by an "adequate factual base" as required by Goal 2.

Although it recognized that OAR 660-004-0020(2)(c) requires an assessment of the agricultural qualities of resource land and the impacts of removing the land from the resource base, LUBA concluded that OAR 660-012-0070(7) provides the method of complying with the general ESEE analysis requirement of Goal 2, Part II(c)(3). LUBA agreed with the county's view that OAR 660-012-0070 supersedes the exception requirements of OAR chapter 660, division 4, and it also determined that the county's findings were supported by substantial evidence.

Pursuing a consistent theme, petitioner disputes LUBA's understanding of the relationship between the exception and transportation planning rules. Petitioner asserts that the exception rule, OAR 660-004-0020(2)(c),

---

native area[ ] considered by the jurisdiction for which an exception might be taken, the typical advantages and disadvantages of using the area for a use not allowed by the Goal, and the typical positive and negative consequences resulting from the use at the proposed site with measures designed to reduce adverse impacts. A detailed evaluation of specific alternative sites is not required unless such sites are specifically described with facts to support the assertion that the sites have significantly fewer adverse impacts during the local exceptions proceeding. The exception shall include the reasons why the consequences of the use at the chosen site are not significantly more adverse than would typically result from the same proposal being located in areas requiring a goal exception other than the proposed site. Such reasons shall include but are not limited to, the facts used to determine which resource land is least productive; the ability to sustain resource uses near the proposed use; and the long-term economic impact on the general area caused by irreversible removal of the land from the resource base. Other possible impacts include the effects of the proposed use on the water table, on the costs of improving roads and on the costs to special service districts;

"(d) The proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts. The exception shall describe how the proposed use will be rendered compatible with adjacent land uses. The exception shall demonstrate that the proposed use is situated in such a manner as to be compatible with surrounding natural resources and resource management or production practices. ['Compatible use'] is not intended as an absolute term meaning no interference or adverse impacts of any type with adjacent uses."

required the county to choose the alternative that was least disruptive to resource land and that the county failed to make that choice. Petitioner urges that the error had practical effects because "four of the seven Southern Bypass alternatives considered in that phase did a much better job of avoiding resource land, limiting impacts on adjacent resource lands, and utilizing exception lands than Alterative 3J, the chosen alternative."

Although LUBA opined that "OAR 660-012-0070(7) provides the method of complying with the general ESEE analysis requirement of Goal 2, Part II (c)(3)," the county considered the more extensive ESEE compliance criteria set out in the Goal 2 implementing rule, OAR 660-004-0020(2)(c), to be applicable. The county also made detailed findings regarding several alternative routes for the bypass. In those findings, the county compared the expected impacts of the several alternative routes on agricultural enterprises.

Although the county's findings may be adequate to address all relevant ESEE criteria, we conclude that LUBA's analysis was mistakenly limited to OAR 660-012-0070(7). In order to properly perform its review of the county's decision, LUBA also was required to address whether the county's comparisons were sufficient to satisfy the criteria specified in OAR 660-004-0020(2)(c). The latter rule establishes comprehensive criteria for consideration of the economic, social, environmental, and energy consequences of a particular alternative, whereas OAR 660-012-0070(7) merely adds refinements to those criteria. In particular, OAR 660-004-0020(2) explicitly requires scrutiny of agricultural productivity, sustainability, and the long-term effects of removing land from the agricultural resource base.[10] OAR 660-012-0070(7) does not contain that requirement. Instead, OAR 660-012-0070(7)(b) provides that, to address Goal 2, Part II(c)(3), the decision-maker must

"[d]etermine whether the net adverse impacts associated with the proposed exception site are significantly more adverse than the net impacts from other locations which

---

[10] OAR 660-004-0020(2) is quoted above. 203 Or App at 335-36 n 9.

would also require an exception. A proposed exception location would fail to meet this requirement only if the affected local government concludes that the impacts associated with it are significantly more adverse than the other identified exception sites[.]"

Respondents remonstrate that the more specific provisions addressing transportation uses in OAR chapter 660, division 12, should prevail. Otherwise, respondents argue, contrary to the mandate of OAR 660-012-0070(7), consideration of agricultural impacts will be elevated over any other ESEE impacts. As respondents see things, nothing in the applicable statutes or rules suggests that, when considering transportation alternatives, greater weight is owed to the goal of preserving agricultural land than to other matters.

The difficulty with respondents' approach is that OAR 660-012-0070(2) expressly provides that not only must the provisions of that rule be applied when taking an exception to goals protecting rural agricultural land for a transportation improvement, but the requirements of OAR chapter 660, division 4, Goal 2, and ORS 197.732(1)(c) must be followed as well. If LCDC had intended for transportation improvement exception requirements to be limited to those set out in OAR chapter 660, division 12, it could easily have said so. It did not, however, and whatever difficulty may inhere in applying the two sets of standards, agencies planning transportation improvements on rural land are obliged to apply the rules according to their terms. Consequently, on remand, LUBA must determine whether the county's findings satisfied the criteria in OAR 660-004-0020(2)(c), as well as OAR 660-012-0070(7).

■ In its fourth assignment of error, petitioner asserts that LUBA incorrectly interpreted ORS 197.732(1)(c)(D), OAR 660-004-0020(2)(d), and OAR 660-012-0070(8)(c), when it upheld the county's failure to require ODOT to implement adequate mitigation measures to ensure that the proposed bypass will be compatible with petitioner's farming operation. LUBA concluded that the county did not err in finding that there would be some adverse impacts on petitioner's farming enterprise, including fragmentation and loss of

acreage for farming, but that those impacts could be mitigated to minimize the level of harm.

According to petitioner, OAR 660-012-0070(8)(c) requires that the exception taken for the project must include design and land use measures that will minimize access from the proposed bypass to rural lands and support the continued use of surrounding lands.[11] The county failed to impose such mitigation measures as a condition of approving the exception. Petitioner acknowledges that the design of the bypass has not yet occurred and that full consideration of appropriate mitigation measures cannot occur until the design phase of the project is undertaken. Petitioner nonetheless argues that, under such circumstances, compliance with OAR 660-012-0070(8), OAR 660-004-0020(2)(d), and ORS 197.732(1)(c)(D) requires that the county impose a condition of approval that ODOT incorporate mitigation measures at the design phase and that petitioner be permitted to challenge any failure to comply with the measures. Petitioner relies on *Meyer v. City of Portland*, 67 Or App 274, 279-80, 678 P2d 741, *rev den*, 297 Or 82 (1984), for the proposition that a two-stage exception approval process is legally permissible only if interested parties have a full opportunity to be heard before the decision is final.

The record demonstrates that the bypass is being developed in a two-tiered process. After Federal Highway Administration approval of the "Location Final Environmental Impact Statement," ODOT will begin the second tier of the process, during which it will complete design of the road

---

[11] OAR 660-012-0070(8) provides:

"To address Goal 2, Part II(c)(4), the exception shall:

"(a) Describe the adverse effects that the proposed transportation improvement is likely to have on the surrounding rural lands and land uses, including increased traffic and pressure for nonfarm or highway oriented development on areas made more accessible by the transportation improvement;

"(b) Demonstrate how the proposed transportation improvement is compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts;

"(c) Adopt as part of the exception, facility design and land use measures which minimize accessibility of rural lands from the proposed transportation facility or improvement and support continued rural use of surrounding lands."

and interchanges. According to respondents, when the final alignment of the bypass is determined,

> "petitioner and the county will have accurate information about the actual impacts of the project, and the county can impose specific conditions of mitigation upon ODOT to address those impacts. * * *
>
> "* * * The petitioner in this matter will have a full opportunity at the next stage of the process to request specific conditions of mitigation that accurately address impacts of the project."

Respondents also note that the project must be found to be in accord with the county's comprehensive plan and statewide goals before final design and the necessary environmental impact statement may be completed and the project constructed.

Missing from respondents' argument is any citation to a source of law requiring such second phase approvals and providing a procedure for participation—and possible appeal—by interested parties. Specific ordinance-based references to the procedural requirements for a second tier of development would have settled this issue. Our review of the county's findings shows, however, that the county understood that hearings would be required as part of future land use decisions regarding Interchange Area Management Plans and final environmental impact statements in order to secure final approval of the project. In an intergovernmental agreement setting out the responsibilities of ODOT and the county, those parties stipulated that "final determination of measures to mitigate impacts to natural resources will require additional land use decision-making by Yamhill County. Only after ODOT has completed the design phase of the Bypass Project can ODOT go forward with construction of the Bypass and East Dundee Interchange."

In view of the county's announced plan to hold further hearings and address mitigation matters and the county's announced use of a phased approval process in its decisions on review, we conclude that, in the first tier of the project, the county was not required to impose a condition requiring mitigation. The county's decision embodies the understanding that mitigation will be required, and we see

little practical or substantive difference between a condition calling for future mitigation and an announced phasing of an improvement project that incorporates mitigation as part of future land use decisions. Accordingly, we reject petitioner's fourth assignment of error.

In its fifth assignment of error, petitioner urges us to concurrently decide this case and the related matter of *1000 Friends of Oregon v. City of Dundee*, CA A129505. Below, petitioner asked that LUBA remand the instant decision to the county should the *City of Dundee* decision be remanded. The basis of petitioner's request was its view that, if the city's decision were remanded, the consistency of the instant decision with the city's comprehensive plan would be in question. Because of our disposition of the *City of Dundee* case and this case, we need not further address petitioner's concern. *See 1000 Friends of Oregon v. City of Dundee*, 203 Or App 207, 124 P3d 1249 (2005).

Reversed in part and remanded for further review in consideration of all relevant exception criteria, including provisions of OAR chapter 660, division 4; otherwise affirmed.

Appendix A

Newberg - Dundee
Transportation Improvement Project
Goal Exception

99W

Newberg

East Newberg
Interchange

Dundee

219 Interchange

Dayton
Interchange

East Dundee
Interchange

Recommended Alternative
Modified Alternative 31
Urban Growth Boundary

118

Dayton